AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT
**11/6/25**
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ MRV ___ DEPUTY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

November 6, 2025

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ ch ___ DEPUTY

United States of America

v.

JOSE JAVIER DIAZ, aka "Kaps"

Defendant.

Case No.    2:25-mj-06956-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between on or about the dates of October 1, 2023, and November 3, 2025, in the county of Santa Barbara in the

Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Jolene Las*
Complainant's signature

Jolene Las, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    **November 6, 2025**

Judge's signature

City and state:    Los Angeles, California

Hon. Brianna Fuller Mircheff, U.S. Magistrate Judge
Printed name and title

AUSA:    Nicholas Purcell, x3752

## AFFIDAVIT

I, Jolene Las, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for **Jose Javier Diaz**, also known as "Kaps" ("**DIAZ**") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) (Distribution of Methamphetamine).

2.    This affidavit is also made in support of an application for a warrant to search the following:

a.    The residence of **DIAZ**, an apartment located at 10532 La Reina Avenue, Apartment A, Downey, California 90241 (the "**SUBJECT PREMISES**"), as described further in Attachment A-1;

b.    The person of **DIAZ**, as described further in Attachment A-2.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (Possession of Firearm/Ammunition by Convicted Felon) and 21 U.S.C. § 841(a)(1) (Manufacture, Distribution, or Possession of Controlled Substances) (collectively, the "Subject Offenses"), as described further in Attachment B.

4.    Attachments A-1, A-2, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely there is

sufficient probable cause for the requested complaint and arrest and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

6.    I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since January 2024.  I am currently assigned to the Glendale I Field Office of the Los Angeles Field Division of ATF, which conducts investigations involving violations of federal firearms, explosives, and narcotics laws.  My experience as an ATF SA includes, but is not limited to, conducting physical surveillance, executing multiple search and arrest warrants, and participating in controlled narcotic/firearm purchase operations involving the use of confidential informants and undercover agents to make controlled purchases of narcotics and/or firearms.

7.    As part of my training, I attended the Federal Law Enforcement Training Center located in Glynco, Georgia, where I completed the Criminal Investigator Training Program and ATF Special Agent Basic Training courses.  During that time, I received training in firearm and ammunition identification, the means and methods of firearm trafficking, and the examination of

electronic devices in furtherance of the illegal possession, sale, and transfer of firearms and narcotics.

8.    Prior to my employment with ATF, I was employed by the Department of Veterans Affairs as a police officer for approximately eight months.  I received a Bachelor of Science in both Criminal Justice and Political Science from the University of Wisconsin-Platteville in 2023.  During my collegiate time, I interned with the Department of Homeland Security ("DHS") in Washington, D.C.

### III.  SUMMARY OF PROBABLE CAUSE

9.    **DIAZ** is a convicted felon who sold methamphetamine and a firearm to an ATF Confidential Informant (the "CI")[1].

10.   On or about the week of December 8, 2024, **DIAZ** offered to sell narcotics to the CI via mocospace.com messages under the username "x_kaps._x".

11.   Between July 24, 2025, and September 25, 2025, the CI conducted three controlled purchases of narcotics, including one involving purchasing a firearm from **DIAZ**.

12.   On or about July 24, 2025, the CI purchased approximately 33.15 grams of pure methamphetamine from **DIAZ** while in the CI's vehicle parked outside the **SUBJECT PREMISES**.

---

[1] The CI has worked for ATF since 2011. He/she has felony convictions for RICO in 2010 for which he/she received 23 months' custody, and possession of a controlled substance in 1997, for which he/she received 36 months' probation. He/she has received approximately $384,250 over 13 years in connection with his/her work as a CI. The information provided by CI has been reliable thus far.

13. On or about July 30, 2025, the CI purchased approximately 54.53 grams of pure methamphetamine and a Smith & Wesson 625 .45 caliber revolver from **DIAZ** while inside the CI's vehicle parked outside the **SUBJECT PREMISES.**

14. On or about September 25, 2025, the CI purchased approximately 26.9 grams of pure methamphetamine from **DIAZ** while inside the **SUBJECT PREMISES.**

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

15. Based on my review of law enforcement reports, photographs, conversations with other law enforcement agents, and my own observations and knowledge of the investigation, I am aware of the following:

**A.    Background of DIAZ**

16. On or about October 8, 2025, I reviewed a Consolidated Criminal History Report for **DIAZ** and obtained certified conviction documents which indicate that:

a.   On or about September 28, 2009, in the Superior Court of the State of California, Los Angeles County, case number BA356678-01, **DIAZ** was convicted of a felony for a violation of California Penal Code Section 664/211 (Robbery).

b.   On or about February 20, 2013, in the Superior Court of the State of California, Los Angeles County, case number BA406861-01, **DIAZ** was convicted of a felony for a violation of California Penal Code Section 30305(a)(1) (Felon in Possession of Ammunition).

**B.   DIAZ Offers to Sell Narcotics to a CI**

17.   During the week of December 8, 2024, the CI encountered an individual on mocospace.com with the username of "x_kaps._x", who posted publicly in an online "Los Angeles" chat room that "x_kaps._x" had narcotics for sale.  The CI messaged "x_kaps._x" on mocospace.com about purchasing methamphetamine. "x_kaps._x" replied to the CI and informed the CI that the methamphetamine would cost $120 an ounce.  The CI and "x_kaps._x" exchanged phone numbers.  The CI received a text from phone number (760)-286-5509 reading "Is kaps from moco."

18.   During the week of January 5, 2025, the CI contacted "Kaps" to purchase narcotics.  "Kaps" texted the CI the Cash App username "$diazkaps".  During the conversation, **DIAZ** told the CI, "I be slanging dope for 28 years u think a mofo like u is going to tell me how to run my business man get the fuck out of here."

19.   A law enforcement internet search of "diazkaps" revealed that a Facebook user, with a screen name of Jose J. Diaz (www.facebook.com/profile.php?id=100012544936158), had commented the Cash App username "$diazkaps" on a public Facebook page.  Law enforcement reviewed the public Facebook account of "Jose J. Diaz" and were able to view publicly-posted photographs on the account.  Law enforcement noticed that the person in the Facebook photographs appeared to be the same person as the photographs on the "x_kaps._x" mocospace account.  Los Angeles Police Department ("LAPD") officers also used LAPD departmental

resources to identify the user of the "x_kaps._x" mocospace account as **DIAZ**.

20.  During the week of July 22, 2025, an individual with the username "Maldito" messaged the CI on a public forum chat on mocospace.com.  On the same day, "x_kaps._x" privately messaged the CI and referenced a portion of the CI's conversation with "Maldito" and offered, "Ill hook you up fat fat."  "x_kaps._x" texted the CI the address of his residence: 10532 La Reina Ave., Downey, California 90241 (the **SUBJECT PREMISES**); his phone number: (760)-286-5509; and the price of $140 for an ounce of methamphetamine.  ATF SA Victor Muglia used law enforcement databases to confirm **DIAZ** was a resident of 10532 La Reina Ave., Apt. A, Downey, California 90241.

C.  **July 24, 2025, Controlled Purchase of Narcotics from DIAZ**

21.  On or about July 24, 2025, **DIAZ** agreed to sell the CI methamphetamine.  At a predetermined location, SA Muglia searched the CI's person and vehicle for money and contraband and found none.  SA Muglia provided the CI with $800 in United States currency and equipped the CI with electronic transmitting and recording equipment.

22.  Law enforcement established surveillance around the **SUBJECT PREMISES**, where the controlled purchase was expected to take place.  SA Muglia followed the CI to the **SUBJECT PREMISES** and observed the CI park on the street near the **SUBJECT PREMISES**.  The CI attempted to call **DIAZ**, but there was no response.  Under the direction of law enforcement, the CI

departed the location and surveillance units followed the CI. As the CI began to drive back to the predetermined meeting location, **DIAZ** called the CI and told the CI he went to Barstow. The CI advised that he/she would head back to the **SUBJECT PREMISES.**  Law enforcement then re-established surveillance around the **SUBJECT PREMISES.**  Surveillance units observed the CI park on the street near the **SUBJECT PREMISES.**  ATF TFO Villasenor observed **DIAZ** walk from the direction of the **SUBJECT PREMISES** and meet with the CI by the CI's vehicle for a couple of minutes.  The CI told **DIAZ** that he/she wanted to purchase an ounce of narcotics for $140 but handed **DIAZ** $150.  Because **DIAZ** did not have $10 in change, **DIAZ** agreed to provide the CI with an additional $10 worth of methamphetamine.  According to the audio/visual recording, the CI asked for a "ten bag" and **DIAZ** replied, "I'll get you a dub dub."[2]  **DIAZ** returned to the **SUBJECT PREMISES** to retrieve the additional methamphetamine.  After a short period of time, **DIAZ** jogged back to the CI's vehicle.  The CI and **DIAZ** had a brief conversation, and then **DIAZ** walked back towards the **SUBJECT PREMISES.**  The CI then left the area.

23.  ATF Group Supervisor Tolliver Hart observed the CI travel back to the predetermined meeting location.  SA Muglia retrieved two plastic bags from the CI that contained a crystal-like substance of suspected methamphetamine.  SA Muglia searched the CI and the CI's vehicle for additional contraband and found none.  SA Muglia retrieved $650 in unused ATF funds from the CI.

---

[2] Based on my training and experience, a "10 bag" is $10 worth of narcotics.

24.   SA Muglia showed the CI an unmarked photo of **DIAZ,** and the CI confirmed **DIAZ** was the person who had sold him/her the narcotics.

25.   SA Muglia reviewed the audio/visual recordings and confirmed they were consistent with the statements made by the CI.

26.   The substance that the CI purchased during the controlled purchase was sent to the United States Department of Justice – Drug Enforcement Administration ("DEA") Southwest Laboratory (the "DEA Lab").  On or about August 14, 2025, the DEA Lab produced a report that stated that the suspected methamphetamine was in fact approximately 33.15 grams of pure methamphetamine.

D.   **July 30, 2025, Controlled Purchase of Narcotics, a Firearm, and Ammunition from DIAZ**

27.   During the week of July 27, 2025, **DIAZ** contacted the CI via phone number (760)-286-5509.  Under the direction of law enforcement, the CI arranged to meet **DIAZ** to purchase methamphetamine and a firearm.

28.   Law enforcement personnel established surveillance around the **SUBJECT PREMISES,** where the controlled purchase was expected to take place.  SA Muglia searched the CI's person and vehicle for money and contraband and found none.  SA Muglia provided the CI with $800 in United States currency and equipped the CI with electronic transmitting and recording equipment.

29.   SA Muglia observed the CI travel to the **SUBJECT PREMISES** and park on the street near the **SUBJECT PREMISES.  DIAZ**

and the CI spoke on the phone, and **DIAZ** told the CI he would come out and meet the CI.  Detective Larini observed **DIAZ** walk from the direction of the **SUBJECT PREMISES** and enter the CI's vehicle.  As captured by the audio/visual recordings, **DIAZ** and the CI discussed the price of methamphetamine.  The CI agreed to purchase the methamphetamine for $260.  **DIAZ** and the CI also discussed firearms, and **DIAZ** said, "I got a 45 right now."  **DIAZ** then offered to sell the CI a firearm for $1,200.  The CI told **DIAZ** he/she did not have the money for it right now.  **DIAZ** then exited the CI's vehicle.  After **DIAZ** exited the CI's vehicle, the CI departed the location.

30.  SA Muglia then instructed the CI to return to the predetermined meeting location.  SA Muglia provided the CI with an additional $800 of United States currency to purchase the firearm from **DIAZ**.  The CI called **DIAZ** and told **DIAZ** he/she went to the bank and would return to purchase the firearm.

31.  The CI returned to the **SUBJECT PREMISES**.  The CI called **DIAZ**, and **DIAZ** said he would meet the CI outside.  Det. Larini observed **DIAZ** walk from the **SUBJECT PREMISES** and enter the CI's vehicle.  The CI said he/she would purchase the firearm, and **DIAZ** said the firearm was his favorite.  According to the CI, he/she was confused about the price of the firearm and gave **DIAZ** $1,300 for the firearm.  As captured by the audio/visual recording, **DIAZ** showed the CI rounds of ammunition and stated he/she must wipe fingerprints off of them.  **DIAZ** exited the CI's vehicle, and the CI departed the location.

32.  After the controlled purchase, the CI returned to the predetermined meeting location.  Law enforcement recovered from the CI a plastic bag that contained a crystal-like substance suspected to be methamphetamine; a Smith & Wesson 625 .45 caliber revolver, Serial Number: CDU5547; and five rounds of X-treme .45 caliber ammunition.  SA Muglia searched the CI and the CI's vehicle for additional contraband and found none.  SA Muglia retrieved $40 of unused ATF funds from the CI.

33.  SA Muglia reviewed the audio/visual recordings and confirmed they were consistent with the statements made by the CI.

34.  The substance that the CI purchased during the controlled purchase was sent to the DEA Lab.  On or about August 14, 2025, the DEA Lab produced a report that stated that the suspected methamphetamine was in fact approximately 54.53 grams of pure methamphetamine.

35.  On or about September 25, 2025, ATF SA Tiffany Lamphere, an ATF Firearms and Ammunition Interstate Nexus Expert, examined the firearm and ammunition from the controlled purchase that was conducted on or about July 30, 2025, and determined:

a.    The firearm was a Smith & Wesson model 625, .45 caliber, revolver bearing serial number CDU5547, manufactured by Smith & Wesson, in Massachusetts, and therefore the firearm moved in interstate commerce.

b.    The five rounds of .45 caliber ammunition with headstamp "X-TREME" were manufactured by Freedom Munitions in

Idaho, and therefore the ammunition moved in interstate commerce.

**E.    September 25, 2025 Controlled Purchase of Narcotics from DIAZ**

36.   During the week of August 3, 2025, **DIAZ** texted the CI and offered narcotics for sale.  **DIAZ** sent the CI a photograph of an AR-style rifle in a cardboard box, and stated it was for sale for $2,700.  Under the direction of law enforcement, the CI attempted to purchase the rifle the following day; however, **DIAZ** stated it had been sold.  Later that day, **DIAZ** messaged the CI via mocospace.com and stated he received a "new batch" of narcotics that was better than the last batch.

37.   During the week of August 24, 2025, **DIAZ** contacted the CI on mocospace.com and offered a lower price for the sale of narcotics.  **DIAZ** advised the CI he had already sold the firearms he had.  On the same day, **DIAZ** sent the CI a message about having a Ruger for sale, and that he would have to check with his friend to whom the firearm belonged.  The following day, the CI contacted **DIAZ** about the Ruger, and **DIAZ** stated that he had already sold it.  **DIAZ** again advised the CI he would let the CI know if he had a firearm for sale.

38.   During the week of September 21, 2025, the CI advised SA Muglia that **DIAZ** posted photographs of firearms on a public forum on mocospace.com.  At the direction of law enforcement, the CI contacted **DIAZ** to arrange for a controlled purchase of a firearm.  Later that day, **DIAZ** agreed to sell the CI a quarter pound of methamphetamine.

39.  On or about September 25, 2025, the CI met with law enforcement personnel at a predetermined location.  Law enforcement personnel established surveillance near the **SUBJECT PREMISES**, where the controlled purchase was expected to be conducted.  SA Muglia searched the CI's person and vehicle for money and contraband and found none.  SA Muglia provided the CI with $1,950 in United States currency and equipped the CI with electronic transmitting and recording equipment.

40.  SA Muglia surveilled the CI while he/she traveled to the **SUBJECT PREMISES,** and observed the CI park on the street near the **SUBJECT PREMISES.**  The CI attempted to call **DIAZ**, but **DIAZ** did not answer.  ATF TFO Sean Spaulding observed the CI exit his/her vehicle, walk to the apartment complex, and stand outside the front door of the apartments located on the first floor.  The CI attempted to call **DIAZ**, but **DIAZ** did not answer.  The CI knocked on the door of the **SUBJECT PREMISES** and asked for "Kaps" and a woman opened the door.  Soon after, **DIAZ** greeted the CI and led the CI into his living room.  According to the CI, **DIAZ** stated he had fallen asleep because his child did not go to school that day, and **DIAZ** did not have the firearm or narcotics for sale as arranged.  The CI observed narcotics, a scale, and other paraphernalia on the coffee table.  **DIAZ** sold the CI one ounce of methamphetamine for $150 and told the CI he would let the CI know when a firearm would be available for sale.  As captured by the audio/visual recordings, **DIAZ** handed the CI a plastic bag with a white substance in it.  ATF TFO Spaulding observed the CI walk from the apartment doors located

on the first floor and return to his/her vehicle.  The CI then departed the location.

41.  SA Muglia observed the CI as he/she traveled back to the predetermined meeting location.  SA Muglia then retrieved from the CI a plastic bag that contained a crystal-like substance of suspected methamphetamine.  SA Muglia searched the CI and the CI's vehicle for additional contraband and found none.  SA Muglia retrieved the $1,800 of unused ATF funds from the CI.

42.  SA Muglia reviewed the audio/visual recordings and observed they were consistent with the statements made by the CI.

43.  The substance that the CI purchased during the controlled purchase was sent to the DEA Lab.  On or about October 24, 2025, the DEA Lab produced a report that stated that the suspected methamphetamine was in fact approximately 26.9 grams of pure methamphetamine.

## V.  TRAINING AND EXPERIENCE ON ITEMS TO BE SEIZED FROM A CRIMINAL'S RESIDENCE

44.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms and narcotics investigations, I am aware of the following:

45.  Persons who possess, purchase, or sell firearms and narcotics generally store their firearms and narcotics and the proceeds from their firearm and narcotics sales at locations

over which they exercise dominion and control, including their residence.  In this regard, I know that:

a.    People who possess, purchase, or sell firearms and narcotics often maintain evidence, including those items listed in Attachment B, at their residences so that they have fast and convenient access to those items.  Furthermore, because people who possess, purchase, or sell firearms and narcotics are unlikely to store the bulk of their assets in safe locations like banks, they can protect their assets by keeping them close at hand in places like their residences.

b.    People who possess, purchase, or sell firearms and narcotics maintain books, records, customer lists, receipts, notes, ledgers (often referred to as "pay/owe" sheets) and other papers, for extended periods of time, relating to acquisition and distribution of firearms and narcotics.  People who possess, purchase, or sell firearms and narcotics also maintain addresses, telephone numbers, and contact information for co-conspirators.

c.    People who possess, purchase, or sell firearms and narcotics often must keep on hand large amounts of money to maintain and finance their ongoing criminal activity.

d.    People who possess, purchase, or sell firearms and narcotics often securely store their illegal proceeds, (cash, currency, and financial instruments or documents of monetary value), as well as firearms and narcotics, inside a safe on the premises.

e.    People who possess, purchase, or sell firearms and narcotics often maintain evidence of their firearm and narcotics transactions on their computers, cellular telephones, and other digital devices.  They do this because these devices can hold substantial amounts of information in very compact locations.  Furthermore, storing evidence of criminal activities on digital devices such as cellular telephones, computers, iPads, etc. provides an advantage to the criminals, as they are often able to lock the devices and protect the evidence of criminal activity from being observed by law enforcement officers.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

46.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

47.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

48.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **DIAZ's** thumb and/or fingers on the device(s); and (2) hold the device(s) in front of **DIAZ's** face

with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

49. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

50. For all the reasons described above, there is probable cause to believe that **DIAZ** has committed violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)(Distribution of Methamphetamine).

51. Further, there is also probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses, will be found in a search of the **SUBJECT PREMISES** and on the person of **DIAZ**, as further described above and in Attachments A-1 and A-2 of this affidavit.

Jolene Las, Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 6th day of
November, 2025.

_____
HONORABLE BRIANNA FULLER MIRCHEFF
UNITED STATES MAGISTRATE JUDGE